IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| RAYMOND VUONCINO, § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | Civil Action No. 3:21-CV-01046-K |
| § | |
| FORTERRA, INC., UNITED STATES § | |
| PIPE FABRICATION, LLC, JEFFREY § | |
| BRADLEY, and WILLIAM KERFIN, § | |
| § | |
| Defendants. § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are: (1) Defendants Forterra, Inc. and United States Pipe Fabrication, LLC's (USP Fabrication, and together with Forterra, the "Corporate Defendants") Motion to Dismiss Plaintiff's Sarbanes-Oxley Claim for Failure to State a Claim (Doc. No. 195); and (2) Defendants Jeffrey Bradley and William Kerfin's (collectively, the "Individual Defendants") Motion to Dismiss Plaintiff's Sarbanes-Oxley Claim for Failure to State a Claim and their Joinder in the Corporate Defendants' Motion to Dismiss (Doc. No. 196). The Court has carefully considered each of the motions, the response, the replies, the supporting appendices, the applicable law, and the relevant portions of the record. For the reasons set forth in Section IV.A.1 of the Corporate Defendants' Motion, the Court **GRANTS** Defendants' motions.

1

I.      Background

Plaintiff Raymond Vuoncino brings this civil action under the Sarbanes-Oxley's (SOX) whistleblower protection provision alleging Defendants retaliated against him after he called attention to certain allegedly-unlawful accounting practices used by Forterra—a publicly-traded company (NASDAQ Symbol: FRTA), headquartered in Irving, Texas, that manufactures pipes and other products for water and drainage infrastructure systems—and its subsidiaries. Am. Compl. ¶¶ 14, 34. Specifically, USP Fabrication and its sister-company non-party United States Pipe and Foundry Company, LLC (USP Foundry) are both wholly-owned subsidiaries of non-party United States Pipe Holdings, Inc. (USP Holdings), which in turn is wholly-owned by Forterra, as illustrated by the following, simplified diagram:



See id. ¶¶ 1, 9–14. In 2016 and early 2017, Bradley was Forterra's CEO, and Kerfin was Forterra's President of Water Pipe & Products and President of USP Foundry. Id. ¶¶ 15, 17.

In his Amended Complaint, Vuoncino alleges that he has 25 years of experience in corporate finance. Id. ¶ 5. In 2013, he was "retained as a consultant" by non-party United States Pipe (USP) "to evaluate USP's fabrication business." Id. ¶ 5. A few

months later, he "became a direct employee of USP" and was given the title of General Manager for USP Fabrication. *Id*. ¶ 6. Thereafter, Vuoncino "worked for" USP Fabrication primarily from his home office in New Jersey and "received W-2's as a New Jersey employee." *Id*. ¶ 7. In 2015, Vuoncino was promoted to Vice President of Corporate Development for USP. *Id*. ¶ 11.

In April 2016, Forterra acquired USP Holdings, and its subsidiaries, including USP Foundry and USP Fabrication. *Id*. ¶ 13. In June 2016, Kerfin promoted Vuoncino to Vice President of Operations for USP Fabrication, and, in July, Kerfin expanded Vuoncino's role to include managing operations for the total network of USP Fabrication branches nationwide. *Id*. ¶ 21.

Forterra completed an initial public offering (IPO) in October 2016. *Id*. ¶ 26. Sometime before that, Vuoncino observed "a disturbing push to accelerate/recognize quarterly 'revenues,' which would inflate net earnings, including directions from Bradley and Kerfin . . . to book everything possible at quarter ends." *Id*. ¶¶ 18−20. Very shortly after the IPO, several executives from USP Foundry and USP Fabrication attended a meeting to discuss the "2017 business plan for USP Fabrication." *Id*. ¶ 28.

At the October 2016 meeting, Kerfin announced that USP Fabrication's projected earnings were "approximately $2.8 million short," but that he had "an easy fix," which was "to have USP Foundry lower the inter-company price of pipes that it charged USP Fabrication." *Id*. ¶¶ 30−31. Through "creative accounting," Kerfin's plan would "inflate USP Fabrication's earnings to approximately $12 million" and "show a

3

much greater profit margin." *Id*. ¶ 32. Vuoncino voiced concern about this inter-company transaction because it "appeared to him to be a 'left pocket/right pocket' move concerning financial performance." *Id*. ¶ 33. Despite Vuoncino's expression of concern, Bradley allegedly told Vuoncino in November that he was doing "a fine job" with USP Fabrication, and Kerfin increased Vuoncino's second half bonus payment based on his "additional contributions to the success of USP." *Id*. ¶ 38.

In November 2016, Vuoncino learned that Forterra intended to follow-through on the inter-company transfers of inventory from USP Foundry to USP Fabrication but, rather than lowering the sales price, USP Foundry would give a $200 per ton "rebate" to USP Fabrication. *Id*. ¶¶ 39–40. Upon learning of this change, USP Foundry and USP Fabrication employees, including Vuoncino, discussed how to properly account for this "rebate." *See id*. ¶¶ 40–43. They determined that "the rebate should be reflected on the balance sheet and any profit should be realized on the P&L statement only at the time the pipe was sold to customers." *Id*. ¶ 42. Vuoncino agreed this was the proper way to account for those transactions. *Id*. ¶ 42. However, a USP Fabrication controller informed Vuoncino in late 2016 that the rebate "would be recognized each month as immediate profit on USP Fabrication's P&L." *Id*. ¶ 43. Vuoncino objected to this "fraudulent accounting" but was told this decision "came from 'above.'" *Id*. ¶¶ 44–45. At this point, Vuoncino was concerned that various Forterra subsidiaries, including USP Fabrication, were using unlawful accounting practices and he expressed this concern to Kerfin. *Id*. ¶¶ 39–45, 48.

4

In early January 2017, Vuoncino learned that USP Foundry shipped seventeen truckloads of pipe to USP Fabrication at the end of December—even though USP Fabrication did not order the pipes, USP Fabrication had sufficient inventory, and many customers were closed at year end. *Id*. ¶ 49. At this point, "[i]t reasonably appeared to Vuoncino that these shipments simply were a way to 'cook the books' by quarter-ending inventory shifting that resulted in USP Foundry booking revenue and USP Fabrication recognizing immediate, fictitious profit thereby skewing the Companies' accounts such that they did not accurately reflect Forterra's performance." *Id*. ¶ 49–50. Vuoncino concluded that "the rebate program constituted shareholder fraud" and "because these filings are transmitted to shareholders . . . by mail or via email, and publicly available on Forterra's website . . . Vuoncino also reasonably believed that the fraudulent accounting constitutes wire and/or mail fraud." *Id*. ¶ 52.

Vuoncino began voicing his concerns to various Forterra and Forterra-subsidiary executives. *Id*. ¶¶ 46–64. Specifically, Vuoncino brought his concerns to Kerfin and Bradley. *Id*. ¶¶ 60, 64. In response to Vuoncino's concerns, Kerfin and Bradley allegedly "would cut Vuoncino off. . . or become noticeably agitated." *Id*. ¶ 64.

Vuoncino was fired on January 20, 2017—just ten days after he asked Kerfin about the alleged manipulation of the accounting process. *Id*. ¶ 60–61, 67. Vuoncino contends that Kerfin terminated his employment because Kerfin believed Vuoncino would not allow the allegedly improper accounting practices to be "swept under the rug." *Id*. ¶¶ 65–67. Kerfin, however, distributed a written announcement to the

5

organization "misleadingly suggesting that Vuoncino voluntarily left USP Fabrication 'to pursue other opportunities' and that the Company was 'reorganizing the leadership of the USP Fabrication business.'" *Id*. ¶ 69. Human Resources (HR) also sent Vuoncino a letter stating, "[d]ue to the Company's decision to restructure the Fabrication business within USP, [Vuoncino's] position . . . is being eliminated." *Id*. ¶ 71.

However, according to Vuoncino—his position was not eliminated, but instead given to a former employee who Kerfin rehired. *Id.* ¶ 70, 72. Thus, Vuoncino contends, "[t]he reason proffered by Forterra for the decision to fire Vuoncino was false and was an excuse to cover up the retaliatory discharge based upon Vuoncino's whistleblowing activities." *Id*. ¶ 74.

Six months after his termination, Vuoncino filed a Complaint with the United States Department of Labor, Occupation Safety and Health Administration (OSHA), alleging that he had "engaged in protected activity, of which the [Corporate Defendants] had knowledge, he was terminated by Defendants as a result of his protected activity and it was a determinative factor in his firing." *Id*. ¶ 79. In his OSHA Complaint, Vuoncino sought "inter alia, reinstatement, compensatory damages, back pay, [and] attorneys' fees and costs." *Id*. ¶ 80. When the OSHA Complaint was not resolved within 180 days, Vuoncino filed this lawsuit in federal district court in New Jersey, bringing claims against Defendants for violation of the whistleblower provision of SOX, violation of the Florida Private Sector Whistleblower Act, common-law wrongful discharge, and common-law breach of contract. *Id*. ¶¶ 92−110.

Defendants responded to Vuoncino's lawsuit by filing a Motion to Compel Arbitration (Doc. No. 12) and a separate Motion to Dismiss for Lack of Personal Jurisdiction, Improper Venue, and Failure to State a Claim (Doc. No. 11). In their brief in support of the Motion to Dismiss, Defendants asserted, among other things, that "[a]t the time of his termination, [Vuoncino] was employed by [USP Foundry], a subsidiary of USP [Holdings], but his role was at [USP Fabrication], another subsidiary of USP [Holdings], which was then owned by Forterra." Corp. Defs.' Br. 14. Defendants argued Vuoncino's SOX retaliation claim should be dismissed because "SOX only affords whistleblower protections for 'employees,' *see* 18 U.S.C. § 1514A(a), and [Vuoncino] does not allege that he was an employee of Forterra. . . . Neither has [he] alleged that the corporate veil should be pierced or that Forterra is the alter ego for [USP Foundry]. Accordingly, [Vuoncino] has failed to allege a required element for a SOX claim . . . ." Corp. Defs.' Br. 38. Defendants further argued that Vuoncino failed to adequately plead that he engaged in a protected activity because he did not allege facts that show his belief that the alleged misconduct constituted a violation of 18 U.S.C. §§ 1341, 1343–44 and/or 1348 was objectively reasonable. *Id.* at 39.

With respect to venue, Defendants disputed that the location of Vuoncino's home office was sufficient to establish venue in New Jersey. *See generally*, Op. (Doc. No. 126). Instead, Defendants argued that venue was proper in the Northern District of Texas because the decision to terminate Vuoncino occurred in Irving. *Id*. at 11. The New Jersey court agreed and—three years later—it transferred the case to this Court.

7

Order 1–2 (Doc. No. 127). Defendants then filed a renewed Motion to Compel Arbitration of all Vuoncino's claims, except for the non-arbitrable SOX claim—which the Court granted (Doc. No. 176).

Next, Vuoncino moved to amend his complaint to add USP Foundry and USP Holdings as defendants and to assert against those defendants the same SOX retaliation claim already asserted against Forterra and USP Fabrication. *See* Sec. Mot. Leave File Am. Compl. 2 (Doc. No. 184). The Court denied this Motion and ordered Defendants to refile their motions to dismiss. *See* Elec. Order (Doc. No. 194). Defendants complied. In their motions, Defendants reassert their arguments that the Court should dismiss Vuoncino's SOX retaliation claim because he fails to allege that either Forterra or USP Fabrication was his employer or that he reasonably believed his employer acted with intent to deceive shareholders. Corp. Defs.' Mot. 11. Defendant USP Fabrication additionally asserts that Vuoncino's claims against it are time-barred. *Id.* at § IV. Individual Defendants also separately assert that Vuoncino's complaint fails to comply with Federal Rule of Civil Procedure 9(b). Ind. Defs.' Mot. 5, n.1.

After both motions were filed, Vuoncino filed a Response (Doc. No. 200), and Defendants filed their replies, (Doc. Nos., 201, 202). Accordingly, the motions are fully briefed and ripe for consideration.

8

## II.     Applicable Law

### 1. Rule 12(b)(6) Standard

In considering a Rule 12(b)(6) motion, a court must determine whether the plaintiff has sufficiently stated a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). A well-pleaded complaint must allege facts upon which the claims are based and not merely recite the elements of a cause of action. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The facts must be sufficiently alleged such that the "claim has facial plausibility" and is not merely "possible." *Aschcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A plaintiff pleads a claim with facial plausibility when the "factual content…allows the court to draw the reasonable inference that the defendant is liable." *Id*. In other words, the alleged facts must nudge the plaintiff's claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

The Court "accept[s] all well-pleaded facts as true and view[s] those facts in the light most favorable to the plaintiff." *Stokes v. Gann*, 498 F.3d 483, 484 (5th Cir. 2007) (per curiam). The Court does not, however, "accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007) (quoting *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005)).

The Court must generally determine a motion to dismiss for failure to state a claim based solely on the pleadings, including any attachments thereto. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). The Fifth Circuit also

9

allows the court to consider documents attached to the motion to dismiss when those documents "are referred to in the plaintiff's complaint and are central to [the plaintiff's] claim." *Id*. at 498–99 (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)).

"Although dismissal under Rule 12(b)(6) is ordinarily determined by whether the facts alleged in the complaint, if true, give rise to a cause of action, a claim may also be dismissed if a successful affirmative defense appears clearly on the face of the pleadings." *Clark v. Amoco Prod. Co.*, 794 F.2d 967, 970 (5th Cir. 1986); *see also EPCO Carbon Dioxide Prods., Inc. v. JP Morgan Chase Bank, NA*, 467 F.3d 466, 470 (5th Cir. 2006) ("Although dismissal under rule 12(b)(6) may be appropriate on a successful affirmative defense, that defense must appear on the face of the complaint.").

### 2. SOX Whistleblower Retaliation

Section 806 of SOX, 18 U.S.C. § 1514A, protects employees of publicly-traded companies from being retaliated against by their employers for engaging in certain protected activities, including whistleblowing. *See* 18 U.S.C. § 1514A(a)(1)−(2). To prevail on a SOX retaliation claim, an employee must plead and prove that (1) he engaged in protected activity; (2) his employer knew that he engaged in the protected activity; (3) he suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action. *Allen v. Admin. Review Bd.*, 514 F.3d 468, 475–76 (5th Cir. 2008); *Moody v. Am. Nat'l Ins. (Moody I)*, 466 F. Supp. 3d 727 (S.D. Tex. 2020), *aff'd,* 842 F. App'x. 875 (5th Cir. 2021).

As a threshold matter, the whistleblower entitled to protection must be an employee of the retaliator. *Lawson v. FMR LLC*, 571 U.S. 429, 441–442 (2014) ("Congress presumed an employer-employee relationship between the retaliator and the whistleblower."); 442 ("[T]he whistleblower is an employee of the retaliator."); 449 ("[O]ne can safely conclude that Congress enacted § 1514A aiming to encourage whistleblowing by contractor employees who suspect fraud involving the public companies with whom they work."); *see also*, *Moody v. Am. Nat'l Ins. Co. (Moody II)*, 842 F. App'x. 875, 878 (5th Cir. 2021) ("[T]here must be an employment relationship between the SOX-retaliation claimant and defendant.").

The statute defines "employee" as "an individual presently or formerly working for a company or company representative,…or an individual whose employment could be affected by a company or company representative." 29 C.F.R. § 1980.101. A "company representative" is "any officer, employee, contractor, subcontractor, or agent of a company." *Id.* In *Lawson*, the Supreme Court held that the class of protected employees includes not only those employed by the public company itself, but also employees of privately held contractors and subcontractors who perform work for the public company. *Lawson*, 571 U.S. at 433.

Nonetheless, "[t]he Court explained that the section's enforcement procedures and remedies make it clear that the whistleblower entitled to protection must be an employee of the retaliator." *Moody II*, 842 F. App'x. at 878 (citing *Lawson*, 571 U.S. at 443). Thus, a whistleblower plaintiff's failure to sufficiently plead that the named

11

retaliator defendant is the plaintiff's employer may result in dismissal. *See Moody* I, 466 F. Supp. 3d at 732 ("[Plaintiff's] claim does not satisfy what § 1514A requires of a SOX-retaliation claimant. Because § 1514A contemplate[s] that the whistleblower is an employee of the retaliator, and because [Plaintiff] does not plead facts that establish that he was a covered employee under the provision, he has not stated a claim for SOX-whistleblower retaliation." (citations and internal quotations omitted)); *see also*, *Smith v. Psychiatric Sols., Inc.*, 2009 WL 903624, at *9 (N.D. Fla. Mar. 31, 2009) ("[Defendant] is entitled to summary judgment because [Plaintiff] has not alleged that [Defendant] was her employer, a necessary element of a Sarbanes–Oxley whistleblower claim." (*citing Fraser v. Fiduciary Trust Co. Int'l*, 417 F. Supp. 2d 310, 321–22 (S.D.N.Y. 2006)), aff'd, 358 F. App'x. 76 (11th Cir. 2009).

Alternatively, a plaintiff may proceed against a defendant, that is not the plaintiff's employer, if the plaintiff sufficiently pleads that the defendant is the *alter ego* of plaintiff's employer. *See Lozada-Leoni v. MoneyGram Int'l, Inc.*, 2020 WL 7000874 (E.D. Tex. Oct. 19, 2020). "In order to 'pierce the corporate veil' under the federal common law standard, a plaintiff must show that an alter ego was used to 'perpetrate a fraud' or was 'so dominated' and its corporate form so 'disregarded' that the alter ego 'primarily transacted [another entity's] business rather than [its] own corporate business.'" *Id.* at *21 (quoting *Kirno Hill Corp. v. Holt*, 618 F.2d 982, 985 (2d Cir. 1980)).

### III. Analysis

Defendants assert Vuoncino "failed to sue his employer." Corp. Defs.' Mot. 11. Specifically, Defendants argue that Vuoncino has not alleged that he was an employee of either Forterra or USP Fabrication. *Id*. Defendants further explain—as they did in prior motion to dismiss—that Vuoncino was an employee of USP Foundry, a non-party to this litigation, and Vuoncino failed to plead that either Forterra or USP Fabrication is the alter ego of USP Foundry. *Id.* at 11–12.

Vuoncino responds that a "hotly contested factual issue" in this case is which particular Forterra subsidiary, or subsidiaries, employed him. Pl.'s Resp. 5. He insists that his Amended Complaint sufficiently alleges that he was employed by USP Fabrication, and that Forterra controlled and/or was an alter ego of USP Fabrication. *Id.* He argues that the Court must accept as true the facts alleged in his Amended Complaint and should ignore Defendants' attempt to introduce facts "outside the four corners of the Amended Complaint" to "exacerbate" the factual issue regarding which entity employed him. *Id.* The Court finds Vuoncino's arguments unavailing.

In his Amended Complaint, Vuoncino specifically alleges that he initially was "retained as a consultant" by USP and a few months later he "became a direct employee of USP" and was "given the title of General Manager for USP Fabrication." Am. Compl. ¶¶ 5–6. Thereafter, Vuoncino "worked for" USP Fabrication, primarily from his home office in New Jersey and "received W-2's as a New Jersey employee." *Id*. ¶ 7. Vuoncino further alleges he was later promoted to Vice President of Corporate Development for

13

USP. *Id*. ¶ 11. Significantly, however, Vuoncino never alleges that he was "employed by" Forterra or USP Fabrication; nor does he allege facts to show that Forterra or USP Fabrication was his employer. At most, he alleges that he was employed "by USP" and worked in an executive position "over" USP Fabrication. *See, e.g., id.* ¶ 8, 71. Vuoncino's failure to plead that he was employed by any party named as a Defendant is fatal to his SOX retaliation claim. *See Moody I*, 466 F. Supp. 3d at 730-31 (dismissing plaintiff's SOX whistleblower claims for failure to plead he was employed by defendant, holding conclusory assertions that plaintiff was "functional equivalent of an employee" and was "acting as an employee, contractor and/or subcontractor" of defendant did not meet *Twombly* and *Iqbal* pleading standards); *Smith*, 2009 WL 903624, at *9.

To avoid dismissal, Vuoncino points to his conclusory allegation that USP Fabrication and Forterra are alter egos and his recitations of the elements of his state law causes of action. Pl.'s Resp. 3–4 (citing Am. Compl. ¶ 76). To survive a motion to dismiss, however, a plaintiff must plead "more than labels and conclusions"; he must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 555, 570. Vuoncino's allegations fall short of stating a plausible claim.

Further, while the Court must generally determine a motion to dismiss for failure to state a claim based solely on the pleadings, the Fifth Circuit allows district courts to consider documents attached to the motion to dismiss when those documents "are referred to in the plaintiff's complaint and are central to [the plaintiff's] claim." *Collins*, 224 F.3d at 498–99. Review of this limited extrinsic evidence is permitted because,

14

"[i]n so attaching, the defendant merely assists the plaintiff in establishing the basis of the suit, and the court in making the elementary determination of whether a claim has been stated." *Id*. at 499. Here, the parties submit extrinsic evidence to assist the Court in evaluating whether Vuoncino sued his employer.

Defendants include a copy of Vuoncino's OSHA complaint, which Vuoncino specifically references in his Amended Complaint. *See* Am. Compl. ¶ 79. Vuoncino's OSHA Complaint includes allegations that are virtually identical to the allegations in his Amended Complaint, including allegations that Vuoncino "was hired by U.S. Pipe, Inc. . . . on or about March 1, 2013 as a consultant to evaluate USP's fabrication business," and "a few months later, [he] became a direct employee of USP and was given the title of General Manager for USP Fabrication." Corp. Defs.' Mot. Ex. 2 at 1 (Doc. No. 195-2).

Vuoncino argues that other evidence referred to in his complaint and central to his claim at least raise a fact-issue that he was employed by USP Fabrication, including: (i) Kerfin's January 20, 2017 announcement regarding Vuoncino's separation; (ii) a letter from Defendants' HR representative; (iii) and "at least one" of his W-2s. Pl.'s Resp. 1. Defendants, however, demonstrate that Vuoncino has merely attempted to manufacture a fact-issue by cherry-picking evidence to submit to the Court.

For example, the W-2 Vuoncino provides, which identifies his employer as "U.S. Pipe Fabrication," is from 2015. Pl.'s Resp. Ex. C. (Doc. No. 200-3). If any W-2 were relevant, *see Verchick v. Hecht Invs., Ltd.*, 924 So. 2d 944, 945–46 (Fla. 3d DCA 2006)

15

(finding that W–2 tax forms alone did not establish employment relationship), the relevant W-2s would be from 2016 and 2017, when the alleged unlawful accounting practices and retaliatory conduct occurred. Defendants provided the relevant W-2s, and those documents identify USP Foundry as Vuoncino's employer. Corp. Defs.' Reply Ex. 3 (Doc. No. 201-3); Corp. Defs.' Reply Ex. 4 (Doc. No. 201-4).

Further, the HR letter on which Vuoncino relies is on USP letterhead and states that "[d]ue to the Company's decision to restructure the Fabrication business **within** U.S. Pipe, your position as VP, Operations **over** U.S. Pipe Fabrication is being eliminated." Pl.'s Resp. Ex. C (Doc. No. 200-1) (emphasis added). Nothing in the letter identifies USP Fabrication as Vuoncino's employer. The letter also states that Vuoncino has received a "Confidential Separation Agreement and Full Release of Claims." *Id.* Vuoncino provided a copy of that Agreement with his response, and it states the agreement is "between Raymond Vuoncino ("Employee") and U.S. Pipe and Foundry Company, LLC, and its parents, subsidiaries, and affiliates (collectively referred to in this Agreement as the "Company"). *Id.* at 3.

Finally, Vuoncino asserts that Defendants' argument that Vuoncino was employed by USP Foundry "conflicts" with Kerfin's announcement. Pl.'s Resp. 5. But as Vuoncino himself alleges, Kerfin was Forterra's President of Water Pipe & Products and President of USP Foundry. *See* Am. Compl. ¶¶ 15, 17. The announcement, on Forterra letterhead, states:

> We are reorganizing the leadership of U.S. Pipe Fabrication business. Effective today, Ray Vuoncino [ ] left the organization to pursue other opportunities . . . . I will share details very soon about the new structure for the U.S. Pipe Fabrication business unit that will ensure the success of our Forterra Water Pipe & Products Business Segment and our U.S. Pipe Fabrication Business Unit.

Pl.'s Resp. Ex. B (Doc. No. 200-2). This statement is consistent with the letter from Defendants' HR representative advising Vuoncino that he was fired "[d]ue to the Company's decision to restructure the Fabrication business **within** U.S. Pipe." Pl.'s Resp. Ex. A (Doc. No. 200-1) (emphasis added). Contrary to Vuoncino's argument, Kerfin's announcement does not conflict with Defendants' assertion that USP Foundry was Vuoncino's employer. More importantly, the announcement does not state, or otherwise suggest, that Vuoncino was an employee of USP Fabrication.

To the extent any of the evidence referred to in Vuoncino's complaint and central to his retaliation claim creates uncertainty as to the identity of Vuoncino's employer, it does not raise a genuine issue as to whether his employer was one of the named Defendants.

Vuoncino's failure to sue his employer or sufficiently allege Defendants are his employer's alter ego defeats his SOX retaliation claim. Therefore, the Court pretermits consideration of Defendants' other arguments for dismissal.

## IV. Conclusion

The Court **GRANTS** the Corporate Defendants' Motion to Dismiss Plaintiff's Sarbanes-Oxley Claim for Failure to State a Claim (Doc. No. 195) and the Individual

Defendants' Motion to Dismiss Plaintiff's Sarbanes-Oxley Claim for Failure to State a Claim (Doc. No. 196). Vuoncino's Amended Complaint is therefore dismissed.

**SO ORDERED**.

Signed March 23rd, 2023.

_Ed Kinkeade_
ED KINKEADE
UNITED STATES DISTRICT JUDGE